**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| 1840 P. CHEESEMAN ROAD, LLC and<br>1840 P. CHEESEMAN ROAD OPCO, LLC,<br>2701 Renaissance Blvd., Fourth Floor,<br>King of Prussia, Pennsylvania 19406<br><br>                Plaintiffs,<br><br>         v.<br><br>TOWNSHIP OF GLOUCESTER<br>ZONING BOARD OF ADJUSTMENT, and<br>TOWNSHIP OF GLOUCESTER,<br>1261 Chews Landing Road<br>Blackwood, New Jersey 08021,<br><br>                Defendants. | **CASE NO.:**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>*(Document filed electronically)* |

**COMPLAINT**

Plaintiffs 1840 P. Cheeseman Road, LLC and 1840 P. Cheeseman Road OPCO, LLC, by and through their undersigned counsel, file this Complaint against the Township of Gloucester Zoning Board of Adjustment (the "Zoning Board" or "Board"), and the Township of Gloucester (the "Township"), and, in support thereof, allege as follows:

**I.     INTRODUCTION**

1.     Drug and alcohol abuse is wreaking havoc on public health and safety in communities across the United States, with drug overdose deaths now surpassing traffic accident deaths.  On March 10, 2016, the United States Senate passed the Comprehensive Addiction and Recovery Act of 2016, which recognized the abuse of heroin and prescription opioid painkillers as having "a devastating effect on public health and safety in communities across the United States":

> According to the Centers for Disease Control and Prevention, drug overdose deaths now surpass traffic accidents in the number of deaths caused by injury in the United States. In 2014, an average of more than 120 people in the United States died from drug overdoses every day.

Comprehensive Addiction and Recovery Act of 2016, S.524, 114th Cong., § 2.

2.    Sadly, the overdose death rate in New Jersey is three times the national average, with Camden County (including Gloucester Township) accounting for the highest percentage of overdose deaths in New Jersey's twenty-one counties.

3.    Recognizing addiction's devastating effects, the New Jersey Legislature has declared:

> [H]uman suffering and social and economic loss caused by drug addiction are matters of grave concern to the people of the state and it is imperative that a comprehensive program be established and implemented through the facilities of the state, the several counties, the federal government, and local and private agencies to prevent drug addiction and to provide diagnosis, treatment, care, rehabilitation for drug addicts.

N.J.S.A. 30:6C-1.

4.    As affiliates of Recovery Centers of America ("RCA" or "Recovery Centers"), Plaintiffs' mission is to provide neighborhood-based recovery campuses for patients suffering from drug and alcohol addiction.

5.    To fulfill that mission, Plaintiffs purchased a 150-acre parcel in Gloucester Township's Institutional Zone – a zone specifically designated for residential healthcare facilities, among other uses – and plan to imminently construct and operate on the site residential healthcare facilities dedicated to treating drug and alcohol abuse.

6.    Steeped in pretext, the Defendants have thrown one illegal hurdle after another in Plaintiffs' path, thereby presenting "the familiar conflict between the legal principle of non-

discrimination and the political principle of not-in-my-backyard." *New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 296 (3d Cir. 2007).

7.     Ignoring the plain language of the Township's Land Development Ordinance, which expressly states that residential healthcare facilities and residential uses ancillary thereto are permitted uses in the Institutional Zone, the Defendants have illegally (a) burdened Plaintiffs with seven days of unnecessary hearings before the Township's Zoning Board and Planning Board, (b) caused Plaintiffs to litigate against both Boards when they improperly denied Plaintiffs' previous applications, (c) required Plaintiffs to seek a use variance for a use that is expressly permitted under the governing ordinance, (d) denied Plaintiffs' use variance in a kangaroo proceeding that screamed pretext and discrimination (with the Defendant Board finding that Plaintiffs' four step-down inpatient residential treatment facilities did not qualify as residential healthcare facilities under the Ordinance because, in the Board's arbitrary and capricious view, they are "more of a residence than a treatment center"), and (e) denied Plaintiff's preliminary site plan for the residential detoxification facility which it had already approved as a permitted use, thereby requiring Plaintiffs to start the entire application process anew, for a third time, based on a fictional jurisdictional deficit.

8.     Having erected one improper procedural hurdle after another in service of its openly discriminatory objectives, the Board has delayed life-saving treatment needed by Plaintiffs' prospective patients who reside in and around Gloucester Township, jeopardized Plaintiffs $8.8 million investment in the project, and caused Plaintiffs to suffer substantial and continuing economic harm, including lost profits.

9.     As a result of the wrongdoing alleged herein, Plaintiffs seek compensatory damages, punitive damages, injunctive relief, and attorneys' fees and costs, and assert claims

under the Constitution of the United States, 42 U.S.C. § 1983, 42 U.S.C. § 12132 (the "Americans with Disabilities Act" or "ADA"), 42 U.S.C. § 3601 (the "Fair Housing Amendments Act" or "FHAA"), 29 U.S.C. § 791 (the "Rehabilitation Act" or "RA"), the Constitution of the State of New Jersey, the New Jersey Municipal Land Use Law, and N.J.S.A. 10:5-1 (the "New Jersey Law Against Discrimination" or "NJLAD").

## II.    **THE PARTIES**

10.    Plaintiff 1840 P. Cheeseman Road, LLC ("1840 P., LLC"), is a Delaware limited liability company, with offices at 2701 Renaissance Blvd., Fourth Floor, King of Prussia, Pennsylvania 19406.  Plaintiff 1840 P., LLC is the owner of a parcel of property located on 1840 Peter Cheeseman Road, Township of Gloucester, County of Camden, State of New Jersey and more specifically known as Block 14003, Lot 13, as shown on the current tax map of the Township of Gloucester.  1840 P., LLC is affiliated with Recovery Centers of America Holdings, LLC, an organization committed to providing cutting edge treatment for drug and alcohol addiction in neighborhood-based residential treatment facilities around the country.

11.    Plaintiff 1840 P. Cheeseman Road OPCO, LLC ("OPCO"), is a Delaware limited liability company, with offices at 2701 Renaissance Blvd., Fourth Floor, King of Prussia, Pennsylvania 19406.  Plaintiff OPCO is affiliated with RCA, and is the operating company formed for the purpose of operating RCA's campus-like residential treatment facility (the "Facility") in Blackwood, Gloucester Township, New Jersey.

12.    Defendant Township of Gloucester Zoning Board of Adjustment, is an entity created by the Township of Gloucester and is vested with authority under the New Jersey Municipal Land Use Law, N.J.S.A. 40:55D-69 *et. seq.*, to, among other things, hear and decide

appeals where it is alleged by an applicant that there is an error in any decision made by an administrative officer.

13.     Defendant Township of Gloucester is a municipal corporation with the power to zone pursuant to New Jersey's Municipal Land Use Law, N.J.S.A. 40:55D-1, *et seq.* As a matter of law, Defendant Township is responsible for the conduct and policies of the Defendant Zoning Board and is liable to the Plaintiffs for the wrongs alleged herein.

## III.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 & 1343 and over the state claims under 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) & (2) because Defendants are residents of this judicial district, the events or omissions giving rise to the claims set forth herein occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.     BACKGROUND AND FACTS

16.     Unlike other disabled individuals, patients suffering from drug or alcohol addiction have limited treatment options.  If fortunate enough to find an available bed, patients are routinely forced to travel hundreds of miles or more to enroll in a treatment program that typically lasts thirty days.

17.     When that initial treatment course is completed, patients are often shuffled back to the environment in which they began using drugs, surrounded by old temptations and yet disconnected from their recovery community, treatment professionals and other critical resources.

18.     The relapse rate under these all-too-common circumstances is startling high.

19.     In fact, many one-time patients relapse and die without access to immediate medical intervention.

## The RCA Treatment Model

20.     Aided by a team of leading industry and academic professionals, RCA has designed an innovative treatment model to improve patient outcomes by extending the length of treatment while offering the full range of patient services in an integrated healthcare campus environment.

21.     This chronic care model requires facilities to accommodate every stage of patient treatment, including residential detoxification, step-down residential inpatient treatment, and outpatient treatment.

22.     Patients who have completed residential detoxification but who remain unable to care for themselves or otherwise navigate major life activities receive inpatient treatment in a step-down residential treatment facility.  At all times, RCA medical personnel determine and direct the appropriate level of patient care, including eligibility for residence and treatment in RCA step-down residential treatment facilities, including the Facility at issue here.

23.     Critical to the success of its treatment model, RCA locates its healthcare campuses in or near the communities where its patients live, thereby ensuring that patients maintain contact with their peers in recovery and reintegrate into daily life without losing access to treatment providers.

### RCA Affiliate 1840 P., LLC Purchased a Site Zoned for Residential Healthcare Facilities in Gloucester Township, New Jersey

24.     Plaintiff 1840 P., LLC purchased approximately 150 acres in Blackwood, New Jersey for more than six million dollars.  Its plan is to renovate the existing building, construct additional buildings and operate (through RCA affiliate Plaintiff OPCO), a residential healthcare

facility in a campus setting to treat and rehabilitate persons suffering from drug and alcohol addiction (the "Facility").

25.     The property at issue here (the "Property") is comprised of 27.80 acres of the larger tract and is located in the Institutional ("IN") zone.  It currently houses a 31,458 square foot building that was previously the St. Pius X Retreat House, having been used by members of the clergy for residential purposes.

26.     Pursuant to Gloucester Township Land Development Ordinance § 419 (the "Zoning Code" or "Ordinance"), a copy of which is attached hereto as Exhibit A, permitted uses in the IN zone include hospitals, sanatoriums, long term care facilities, assisted living facilities, homes for the aged, and residential health care facilities.

27.     The Ordinance expressly provides that "Buildings within the IN district are often in a complex or campus form integrating residential, office, recreational, health care, houses of worship, and other ancillary uses with its primary function." Ordinance § 419.

28.     Accordingly, not only are residential health care facilities expressly permitted, residential uses ancillary to other primary uses are expressly permitted by the Ordinance.

29.     Prior to purchasing the Property, Recovery Centers' CEO and majority shareholder, J. Brian O'Neill, met with the Mayor of Gloucester Township, David R. Mayer, and the Township's Director of Community Development and Planning, Kenneth D. Lechner, to discuss the proposed facility and confirm that it was a permitted use in the IN zone.

30.     The officials reviewed the applicable provisions of the Zoning Code, including the section addressing permitted uses within the IN zone, and assured Mr. O'Neill that Recovery Centers' project was permitted and would be favorably received.

31.     Shortly thereafter, however, Plaintiff 1840, P., LLC was advised by letter to seek an interpretation of the zoning Ordinance from the Zoning Board pursuant to N.J.S.A. 40:55D-70(b) for a determination as to whether the proposed use as a residential healthcare facility was permitted.

32.     In accordance with the Township's direction, Plaintiff 1840 P., LLC submitted an application for an interpretation of the zoning Ordinance to once again confirm that its residential healthcare facility was a permitted use.   The initial application included plans to build a residential treatment center for detoxification services, residential inpatient treatment, outpatient treatment and a sober living community.

**The Board Raised Pretextual Safety Concerns At Initial Application Hearings**

33.     Public hearings were held before the Zoning Board on January 14, 2015 and February 11, 2015, at which individual Board Members and residents repeatedly voiced concerns that townspeople would not be safe unless RCA's patients were kept under lock and key.

34.     Board solicitor Anthony Costa mused out loud that RCA would attract violent offenders to the community and insisted that all visitors to the Facility submit identification for criminal records checks.   He claimed this demeaning and costly measure was essential because "one of the problems with addicts is they lie . . . almost to the point where you believe them."

35.     The stereotyped fear was all the more unwarranted because, as Plaintiffs' witnesses made clear, as a for-profit company, Plaintiffs would not admit violent offenders who are typically treated by publicly-funded, court-mandated programs.

36.     Chairman McMullin requested that RCA place a deed restriction on the land to prevent a future owner from operating a non-profit rehabilitation facility, and local residents demanded to know how many security guards would be on staff at the Facility.

37.     On or about March 11, 2015, the Zoning Board issued an Interpretation finding that a residential treatment campus for patients suffering from drug and alcohol addiction, including facilities for detoxification services, residential inpatient treatment and outpatient treatment, was a permitted use in the IN zone (the "Interpretation").

38.     However, the Interpretation erroneously instructed that the sober living community was not a permitted use within the IN zone.

**The Gloucester Township Planning Board Denied Plaintiff's Application for Minor Site Plan Approval, Citing Safety Concerns, Among Other Irrational Stereotypes and Pretexts**

39.     In reliance on the Zoning Board's Interpretation, on or about June 15, 2015, Plaintiff 1840 P., LLC submitted an application for Minor Site Plan approval to the Planning Board.  The Minor Site Plan application sought to retrofit the existing building for use consistent with the Interpretation as an inpatient and outpatient drug and alcohol rehabilitation center to include 37 patient beds.

40.     The Minor Site Plan application complied with all use, density and bulk requirements in the IN zone rendering it a "By-Right" application.

41.     Mr. Lechner, the Township Planner and Administrative Officer (the "Administrative Officer") issued a report stating the application was consistent with the Zoning Ordinance and was a permitted use within the IN zone.

42.     At a public hearing on July 14, 2015, Ted Wilkinson, P.E., testified as an expert on behalf of 1840 P., LLC, with his testimony establishing that the Minor Site Plan application met all the requirements for the IN Zone.

43.     During the public portion of the hearing, several members from the public asked questions and spoke in opposition to the application by voicing unfounded safety concerns based

on the types of patients being treated, i.e., recovering drug addicts and alcoholics. There was no evidence suggesting that the Minor Site Plan application failed to comply with the requirements for the IN zone.

44.     One opposing resident complained: "it's near our children, people. I mean, are we not concerned about our children? The safety of our children is more important than anything; money, anything. We should be saying 'no' to this."

45.     Another individual expressed his displeasure, testifying that he was "not okay with the site, where it is, okay, because of the fact that there is a school." In particular, he worried that because the Facility "is not a prison, people can come and go as they please."

46.     Others complained that permitting RCA to open near them would plunge neighboring property values "in the toilet."

47.     Members of the Planning Board themselves voiced similar discriminatory concerns about public safety and property values.

48.     For example, Planning Board member Walter Dority suggested that the Facility would attract drug dealers to the neighborhood and cautioned that Plaintiff 1840 P., LLCs' application was "talking about people with mental conditions, okay, you're talking about people that's on heroin, okay. That's – that's a real big thing."

49.     On several occasions, the Planning Board questioned whether the Facility would be fenced off, conduct patient background checks and employ security personnel.

50.     At the close of the hearing, the Planning Board voted unanimously to deny the application, thereby unlawfully overriding the Interpretation, and ignoring the unrebutted evidence presented, which established beyond question that the application met all of the requirements for the IN zone.

51.     Explaining their votes to deny the application, several Planning Board members cited the lack of patient background checks, the Facility's proximity to schools and public parks, and the specter of neighboring properties being devalued.

52.     In addition to challenging the Facility's proximity to a school, Planning Board Chairman Scott Owens asserted that it was not like a hospital, and suggested that the Zoning Board reconsider whether the Facility was, in fact, a permitted use within the IN zone.

**Plaintiff Sued the Planning Board and Submitted Another Application**

53.     On or about July 15, 2015, 1840 P., LLC submitted an application for Major Site Plan approval to the Planning Board for a use consistent with the Interpretation.

54.     On or about July 30, 2015, 1840 P., LLC commenced suit against the Planning Board in the Superior Court of New Jersey, bearing docket number CAM-L-2930-15, and in the United States District Court for the District of New Jersey, bearing docket number 1:15-cv-05890-JHR-KMW.  The lawsuits challenged the denial of the Minor Site Plan application as arbitrary and capricious in violation of federal and state law.

55.     The application sought approval to expand the existing 31,548 sq. ft. building with three new wings to include: an inpatient treatment center with 125 patient beds, a café, dining facilities, and offices; a new gymnasium for physical therapy; one new treatment center for outpatient care; four step-down residential treatment centers for long-term residential treatment and care to include 192 patient beds and 16 supervisor beds for use by patients after the first thirty days of detoxification and intensive treatment; a new parking lot; a relocated entrance driveway with a monument entrance sign; a storm collection system; and new landscaping and lighting (the "2015 Major Site Plan").

56.     On or about July 27, 2015, the Administrative Official declared by letter that the Major Site Plan Application was not a permitted use in the IN zone and required a "D-1" use variance pursuant to N.J.S.A. 40:55D-70d(1).

57.     On July 29, 2015, 1840 P., LLC filed a timely appeal of the Administrative Official's determination that the Application required a "D-1" use variance (the "Appeal Application").

**Plaintiff Sued the Zoning Board for Conducting a Sham Hearing on Plaintiff's Appeal Application**

58.     On August 4, 2015, by letter from the Administrative Officer, 1840 P., LLC was granted an August 26, 2015 appeal hearing before the Board.

59.     A hearing was held on August 26, 2015, at which Ted Wilkinson, a Professional Engineer, Terry Combs, a Professional Planner, and Mr. O'Neill, principal and majority owner of RCA, testified on behalf of Plaintiff 1840 P., LLC.

60.     The witnesses were duly sworn, each expert was qualified and accepted as an expert in his respective field, and testimony was offered regarding the proposed use.

61.     At the Board's request, Mr. Wilkinson testified regarding the Minor Site Plan application that had been denied by the Planning Board.

62.     Mr. Combs testified as to his familiarity with the Facility and Property, his professional review of the Major Site Plan application and materials submitted in support thereof, his review of the Gloucester Township Zoning Ordinance and the Administrative Officer's determination that the Major Site Plan Application required a "D-1" use variance.

63.     Simply stated, Mr. Combs opined (a) that the Facility as proposed is a permitted use in the IN Zone, (b) that every component of the Major Site Plan Application, including the four residential treatment buildings for step-down inpatient care, is permitted in the IN Zone, (c)

that the proposed use is consistent with the Interpretation, and (d) that the Administrative Officer's determination that the Facility required a "D-1" use variance was patently incorrect and belied by the express provisions of the Zoning Ordinance itself.

64.     During Mr. Combs' testimony, Board solicitor Costa (the "Solicitor") – ignoring the unpleasant truth that only patients being treated for drug and alcohol abuse would reside in the four residential treatment buildings – raised a series of hyper-technical and irrelevant distinctions in a pretextual effort to suggest that the four step-down inpatient treatment buildings were more akin to apartments rather than residential healthcare facilities.

65.     When Mr. O'Neill testified that the Facility was designed to provide better outcomes for disabled patients in dire need, he was chided by Board member Kevin Bucceroni for not having obtained a ruling from the Board in his favor before having purchased the Property.

66.     When he expressed disbelief that he should have sought an advanced interpretation of an Ordinance which on its face plainly states that residential healthcare facilities are permitted within the IN zone and should not have relied on pre-acquisition assurances from the Mayor and Administrative Officer, Board member Bucceroni replied, "Don't trust anything, but God."

67.     Confronted with overwhelming evidence that the Facility as proposed was permitted in the IN Zone and consistent with the Interpretation, and well-aware that no evidence was offered to the contrary, the Board turned again to procedural shenanigans.

68.     The Board's Solicitor explained the doctrine of res judicata – a doctrine with no applicability to the matter before the Board – after which the Zoning Board arbitrarily and

capriciously determined by a unanimous vote that res judicata prohibited it from ruling on the Appeal Application, because the Planning Board had denied the Minor Site Plan Application.

69.     1840 P., LLC filed its third lawsuit on September 16, 2015 in the Superior Court of New Jersey, bearing docket number CAM-L-3516-15, challenging the Zoning Board's decision that res judicata applied to the Appeal Application.

**Plaintiff Settled the Litigation in Return for a Fair Hearing, Only to Face A New Series of Obstruction Tactics from the Zoning Board**

70.     The parties settled the three pending lawsuits.

71.     The Planning Board agreed to reverse its decision denying the Minor Site Plan Application, and 1840 P., LLC agreed to dismiss the pending litigation.

72.     The Planning Board's approval of the Minor Site Plan Application caused the Zoning Board Solicitor to counsel against relying on res judicata as an impediment to a merits decision on the Appeal Application, freeing the Zoning Board to consider the Appeal Application on the merits.  In return, 1840 P., LLC agreed to dismiss its lawsuit against the Zoning Board and to proceed with the Appeal Application before the Zoning Board.

73.     At a public hearing on January 12, 2016, the Planning Board reversed its previous decision and granted 1840 P., LLC's application for Minor Site Plan approval.

74.     A second public hearing on the Appeal Application was held on January 13, 2016, at which the Zoning Board solicitor advised that res judicata no longer applied to the Appeal Application, and that the Zoning Board should proceed to decide the Appeal Application on the merits.

75.     At the request of the Solicitor and the Zoning Board, 1840 P., LLC made a second presentation on the Appeal Application.

76.     Terry Combs and Ted Wilkinson again testified as expert witnesses in the fields of planning and engineering, and J.P. Christen, RCA's Chief Operating Officer, testified as well.

77.     Mr. Wilkinson described the site plans, the proposed construction to expand the existing building, the location and proposed construction of the new buildings, and testified that each building would meet the bulk requirements for the IN zone.

78.     As to the four step-down residential inpatient treatment buildings, Mr. Wilkinson described the layout as similar to a nursing home setting with two patients per bedroom, where patients who needed extended inpatient treatment after completing detoxification and intensive inpatient treatment would reside and receive treatment.

79.     Mr. Wilkinson made clear that only patients receiving required treatment would be permitted to reside on the treatment campus, including the four step-down inpatient treatment buildings which were an integral part of the treatment Facility, and opined that the proposed use was expressly permitted in the IN zone.

80.     Mr. Combs testified to the different provisions of the Ordinance that applied to the Facility – including permitted uses, permitted accessory uses, the express contemplation of campus settings, and residential components to each permitted use – and opined unequivocally that the proposed use was permitted in the IN zone as a residential healthcare facility and hospital, built in a campus configuration.

81.     Mr. Christen testified extensively as to the spectrum of care necessary to treat and rehabilitate disabled persons suffering from addiction.

82.     Like Messrs. Wilkinson and Combs, Mr. Christen testified that all patients, including those in the four step-down inpatient treatment buildings, were required to remain in treatment while residing at the Facility.

83.     As to matters of billing and reimbursement, Mr. Christen testified that, similar to hospital billing, patients (and their insurance companies) would be billed for a treatment component and a room component.

84.     By providing accommodations for step-down inpatient treatment in the same location that the patient received the first thirty days of detoxification and intensive inpatient treatment, patients in need of additional care would have direct access to doctors, treatment, and support groups until they were capable of living on their own and progressing to an outpatient program.

85.     Having no choice but to concede that the inpatient detoxification building, the gymnasium and the outpatient treatment center were permitted under the Ordinance as a hospital use and accessory use, the Board next sought to derail the project by separating out the four step-down inpatient treatment buildings, and improperly attacking their legitimacy as part of the treatment modalities.

86.     The focus was discriminatory and unlawful on its face, and the Board's hyper-technical challenges to the testimony of Plaintiff's experts as to matters involving of the level of treatment, billing for the residential component and security, provide compelling evidence of pretext.

87.     For example, Board Solicitor Costa suggested that if patients residing at one of the four step-down inpatient treatment buildings also received treatment at another building within the larger Facility, then the four inpatient treatment buildings were actually apartments.

88.     Similarly, Chairman McMullin again harped on the need for fencing: "How are you going to secure that whole area?  Fence?  What type of fencing?"

89.     When challenged on the need for fencing the patients in, Chairman McMullin erupted, "we're concerned about these people coming in and out. That's my concern. They're getting treatment, they should probably stay there and not be going in and out."

90.     Near the close of the hearing, an exasperated Mr. Combs insisted that Plaintiffs' proposed use as a residential healthcare facility was specifically permitted in the Ordinance, only to be confronted by the Administrative Officer's arbitrary and capricious view that "Residential substance abuse treatment facility is not specifically listed."

91.     Consistent with its pattern of unlawful behavior, the Board voted to affirm the decision of the Administrative Officer that the application required a use variance because the four step-down inpatient treatment buildings were "more residential" and did not qualify as a residential healthcare facility, hospital or other permitted use in the IN zone.

92.     The Board's decision was unlawful in many respects, as the Zoning Ordinance specifically allows for a residential component to healthcare facilities, and, as the Board's obvious pretext-of-a-rationale confirmed, the decision was motivated by irrational prejudice towards Plaintiffs' disabled patients.

93.     Though Plaintiffs cannot formally apply for state licensure until the Facility's various components move closer to completion, the Plaintiffs fully intend to license the four step-down residential treatment buildings with the State of New Jersey.

**Under Protest, and Preserving its Right of Appeal, Plaintiff Submitted an Application for a Use Variance, which the Board Ultimately Denied, Following Another Sham Hearing**

94.     Plaintiff 1840 P., LLC filed an application for a use variance for the four step-down residential treatment buildings, and preliminary and final Major Site Plan approval for a two phase implementation of the renovations and expansion of the detoxification building,

construction of the gymnasium, outpatient treatment center, four step-down residential treatment buildings, as well as the site improvements for landscaping, parking, drainage, and lighting (the "Use Variance Application").

95.     The Use Variance Application was made with a full reservation of rights and under protest.

96.     After proper notice, public hearings on the Use Variance Application took place on February 24, and March 9, 2016.

97.     Messrs. Wilkinson and Combs again testified as expert witnesses on behalf of the Plaintiff 1840 P., LLC and Mr. O'Neill testified at length, answering questions from the Board and the public.  Maurice Rached, P.E., P.T.O.E., an expert in traffic engineering, also testified as an expert.

98.     To put to rest any remaining questions as to the nature of the treatment to be provided at Plaintiffs' Facility to persons disabled by drug and alcohol addition, to explain and define the scope of the addiction problem facing New Jersey and the country as a whole, and to confirm the urgent need in Gloucester Township for a facility like that proposed, Plaintiffs offered the testimony of two renowned addiction specialists: Dr. Michael DeShields, a physician specializing in addiction medicine in the Gloucester Township area for more than twenty years; and, Deni Carise, PhD, RCA's Chief Clinical Officer.

99.     As Dr. DeShields explained, addiction is a qualifying medical disease whose victims in the Gloucester Township and South Jersey have few comprehensive treatment options. Unfortunately, they are often left with no option but to seek treatment out of state at considerable distance, which increases the risk of relapse when patients return home to stressful and unsupportive surroundings.

100.    Dr. DeShields opined – and his testimony was unrebutted – that as a chronic disease addiction must be treated with a full continuum of care, starting with detoxification and intensive inpatient treatment, followed by successively less intense levels of treatment, which is best accomplished in a structured environment, surrounded by similarly situated and likeminded individuals with nearby access to treatment and services.

101.    As to their status while residing in the four step-down inpatient treatment buildings at issue, the residents would be considered patients that are in treatment from a medical standpoint.

102.    As to societal need and benefit, the unrebutted testimony of Dr. DeShields established that the Facility would greatly benefit the community as a whole, would provide much-needed access to life-saving treatment, and would materially improve outcomes for patients by providing the continuum of care that is essential to the effective treatment of addiction.

103.    The testimony of Dr. Deni Carise was similarly compelling.

104.    Dr. Carise has extensive experience as an academic and clinical program director and advisor for rehabilitation facilities throughout the world.

105.    For twenty years, Dr. Carise has studied addiction as an adjunct professor at the University of Pennsylvania.

106.    In addition to designing and implementing treatment programs across America, Dr. Carise has consulted for the White House and the United Nations, and has developed treatment systems for Egypt, Nigeria, Singapore, Thailand, Taiwan, China, Iraq and Iran.

107.    As her unrebutted testimony established, patients who undergo detoxification and intensive treatment at a facility away from their community are often unable to access treatment when they return home.  Many of these one-time patients either relapse or overdose and die.

108.    Dr. Carise testified about the different levels of treatment patients receive as they progress through recovery, and opined that there is a need for facilities that take responsibility for the full continuum of care.

109.    Dr. Carise attested that this chronic care model, which she would personally implement at the Facility, would achieve improved outcomes for patients.

110.    Dr. Carise further testified that all patients residing within the four step-down inpatient buildings would undergo extensive treatment.  To remove any doubt that these patients would remain in treatment, she provided the Board with a sample treatment schedule, a copy of which is attached hereto as Exhibit B.

111.    Finally, Dr. Carise explained that the size of the Facility was necessary to recruit the required staffing and to treat as many patients as possible based on the need for treatment in the region.

112.    Mr. Wilkinson testified as to the site plan elements and construction plans, in the context of the Use Variance Application and Ordinance, and confirmed the Plaintiff's willingness to comply with all recommendations and requests contained in the Engineer's report and Planner's report.

113.    Mr. Rached testified about the inconsequential impact of the Facility on traffic on the surrounding roadways, based on a traffic study conducted using peak traffic hours and actual traffic numbers on the surrounding roadways.  In short, as Mr. Rached's testimony made clear,

the traffic to be generated by the Facility would have less of an impact than the traffic that would be generated by other permitted uses.

114.    The Board engineer agreed that the traffic engineer's study was properly conducted and complied with industry standards, and that traffic concerns did not exist.

115.    Mr. Combs then testified as to why the Facility was entitled to a use variance, recounting the testimony of Drs. DeShields and Carise – which established the need for treatment facilities in the Gloucester Township area in general, and the need for extended-care treatment centers like the proposed Facility in particular.

116.    Pointing to several state statutes establishing that it is the public policy of the State of New Jersey to strongly support the need for the rehabilitation and treatment of persons suffering from the disease of addiction, Mr. Combs opined that the four long-term treatment buildings are an integral part of the Facility, and that the entire Facility is an inherently beneficial use that serves the health and general welfare by treating the disease of addiction.

117.    As to site issues and other concerns, Mr. Combs' unrebutted testimony established that the site was large enough to accommodate the use, that there would be more than adequate buffers to insulate the Facility from surrounding properties, thereby negating any concern about noise, odor, or other negative impacts, and that security was not a legitimate concern given the proposed staffing and security measures to be implemented at the Facility.

118.    In sum, Mr. Combs opined – and his opinion was unrebutted – that the site was well-suited to the use, would not impair the intent and purpose of the zone plan, and was inherently beneficial, thereby implicating the balancing test established by the New Jersey Supreme Court in *Sica v. Board of Adjustment of Tp. of Wall*, 127 N.J. 152 (1992).

119.    In that regard, Mr. Combs reminded the Board that, since there was no negative impact on the surrounding community from the Facility, even if any negative impact could be identified (though none was identified in the record submitted), the Zoning Board had a duty to impose reasonable conditions to mitigate those effects, instead of merely denying the use variance.

120.    Mr. Combs also opined that, on balance, the benefits associated with the Facility weighed heavily in favor of granting the use variance, and that it was also justified as a reasonable accommodation under the Fair Housing Amendments Act ("FHAA"), which includes in the definition of unlawful discrimination the refusal to make reasonable accommodations in the rules and policies of the Township.

121.    Confirming that the four step-down residential treatment buildings constituted dwellings under the FHAA, and that there was a demonstrated need for the Facility, Mr. Combs's testimony established that a use variance was required here, as a reasonable accommodation under the law.

122.    Ignoring the legitimate considerations applicable to granting a use variance – all of which were addressed and established by the Plaintiff's unrebutted evidence – the Board turned again to pretext.

123.    Chairman McMullin focused on how often Facility staff would conduct patient room checks, and Board Solicitor Costa suggested that patients should be forced to remain in "the more restrictive" detoxification facility for the duration of their treatment, thereby depriving them of the opportunity to progress to the four step-down inpatient buildings on their journey to recover the life skills necessary to safely live on their own and function in a sober society.

124.   Solicitor Costa's failure to appreciate the Board's obligation to consider only evidence, rather than discriminatory stereotypes, is further demonstrated by his characterization of the testimony of Plaintiff's medical experts as "self-serving" because in his uninformed view the four step-down inpatient buildings were unnecessary for treatment.

125.   At the public hearing held on March 9, 2016, Mr. O'Neill testified at length that the purpose of the Facility was to provide a full continuum of care and treatment to persons in recovery, in an effort to improve patient outcomes and save lives.

126.   As to the four step-down inpatient treatment buildings, Mr. O'Neill confirmed their use for the treatment and rehabilitation of patients, reiterated that these buildings are an integral part of the Facility, and reminded the Board that residential uses ancillary to other permitted primary uses were expressly permitted under the Zoning Ordinance.

127.   Having developed thousands of apartment units over an extensive career, Mr. O'Neill is well aware of the difference between an apartment building and a healthcare treatment facility.   He squarely debunked the notion that the four buildings were merely apartments, making it absolutely clear that only patients receiving inpatient care as recovering drug and alcohol abuse addicts would reside in the four residential treatment buildings, and that no part of these buildings or the Facility as a whole would be occupied by non-patients merely seeking a place to reside.

128.   The position staked out by the Board is a nothing more than a pretextual red-herring, because the Zoning Ordinance itself expressly permits residential uses in connection with or ancillary to permitted primary uses.

129.    Accordingly, colleges may have dorms, a church may have a parish house – as was the case with the immediately prior use – and the Plaintiffs' integrated healthcare campus may have residential components as well.

130.    During the public comment portion, many residents voiced support for the Facility – expressing concern over the wide-spread epidemic of drug addiction in the Township and recounting the difficulty finding treatment for themselves or for family members in the Township and the region – while others opposed the Facility based on generalized fears about security and safety.

131.    Not a scintilla of competent evidence was offered to suggest, let alone to establish, that the Facility would result in increased crime or strain municipal services.

132.    The unsupported stereotypical fears included a suggestion that the Facility's plan to conduct bed checks every hour was insufficient to keep the surrounding community safe: "A one-hour bed check, they'd probably be in my – in my bedroom in 15 minutes."

133.    While it is understandable and perhaps appropriate for the public to vent at a public meeting, it is inappropriate and unlawful for members of the Board to express their discriminatory hostility toward a project and Facility designed to mitigate a public epidemic and save lives.

134.    Forgetting that he was a public official sworn to uphold the law, Board member Bucceroni expressed his personal concern that the Facility's patients may commit thefts in the community, based on a family experience with addiction, in which a suffering family member committed theft. Referring to the patients to be treated at the Facility, this Board member expressed the fear that if "somebody breaks into my house and robs what cash I have, I could be in trouble."

135.    In a particularly moving account, one local resident testified that he overdosed in a public park in Camden and received brief hospitalization, but was unable to access additional treatment in the surrounding area:

> I couldn't stop using because I didn't have a way to do it and I had to fly down to Florida. I remember overdosing in Camden, in North Camden, at Pine Point Park and getting out – the police took me to the – the ambulance took me to Cooper Hospital. I remember going there and saying, I probably need detox, I probably need help, what should I do? And they gave me a list of the places, and all the places I called they said they didn't have beds for me. The options weren't there.

136.    Another local resident in recovery testified that he was required to receive addiction treatment as a condition of his parole, but he was ultimately forced to fly to Florida to find an open treatment program, thereby violating a separate parole restriction, which required him to remain within New Jersey.

137.    Several members of the public who worked in the field of addiction treatment stressed the importance of treating addiction as a chronic disease with a continuum of care model just as Plaintiffs' medical experts had explained.

138.    No evidence was presented, expert or otherwise, to challenge the overwhelming evidence as to the urgent need for a comprehensive substance abuse treatment center in the Gloucester Township region.

139.    No evidence was presented, expert or otherwise, that the use variance was an unreasonable accommodation that would fundamentally alter the nature and intent of the zoning Ordinance or result in a financial or administrative burden on the Township.

140.    At the close of the hearing, the Zoning Board voted unanimously to deny the use variance.

141.    Without record support and ignoring overwhelming and uncontradicted evidence to the contrary, the Board held that the four step-down residential inpatient treatment buildings did not constitute an inherently beneficial use, and did not satisfy the positive/negative balance test for a use variance.

142.    To support the unlawful process and discriminatory result that the Board had preordained, members trumpeted the Board's right to determine credibility and thereby reject the expert and fact testimony proffered by the Plaintiff.

143.    The Board failed to appreciate, however, that it was merely engaging in a ruse of unlawful discrimination, in which it used so-called credibility determinations as yet another pretext.

144.    Striking a more candid tone, Board member Chiumento admitted that she voted to deny the request for a use variance because the Facility "should be in a much more rural area than you've picked at this time. And the other thing, although some people disagree, I think there's definitely a safety issue."

**After Improperly Denying Plaintiff's Request for a Use Variance, the Board Refused to Vote on Phase I of the Major Site Plan, Which It Had Already Approved As a Permitted Use**

145.    After denying the use variance, the Zoning Board refused to vote and approve Phase I of the Major Site Plan, which the Board had previously conceded was permitted in the IN zone.

146.    Though the Zoning Board unquestionably retained jurisdiction over the entire Use Variance Application, including the request for Major Site Plan approval, at the urging of solicitor Costa, the Board declared that it had somehow lost jurisdiction to rule on the remainder of the Application.

147.   The Zoning Board's refusal to act on the Phase I of the Major Site Plan, despite having jurisdiction and a legal mandate to do so, provides further evidence of discrimination, pretext and bad faith.

148.   To date, Plaintiffs have invested almost $9 million in the Property and Facility, including approximately $6.7 million for the purchase of the land and buildings, $1.4 million for design and preconstruction activities, $350,000 for professional services (including architectural, engineering, legal, interior design), and $230,000 for facilities expenses.

149.   As a result of the unlawful delay in placing the Facility into operation, Plaintiffs will suffer a variety of economic damages, including substantial lost profits.

150.   The conduct of the Defendants, as aforesaid, was intentional, in bad faith and sufficiently outrageous as to justify the imposition of punitive damages.

151.   Plaintiffs, and their prospective patients, do not have an adequate remedy at law, and will suffer immediate and irreparable harm in the absence of equitable relief, thereby justifying the grant of preliminary and permanent injunctive relief

## V.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of Title II of the ADA)

152.   Paragraphs 1 through 151 above are incorporated by reference, as if fully set forth herein.

153.   The American with Disabilities Act ("ADA") provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the service, program, or activity of a public entity, or be subjected to discrimination by any such entity and makes it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities

from, denying them the benefits of, or otherwise subjecting them to discrimination. 28 C.F.R. § 35.130(b)(4).

154.    Plaintiffs' patients are qualified persons under the ADA with disabilities that substantially impair one or more major life activities.

155.    The first criterion for admission to any part of the Facility is that patients be diagnosed as suffering from drug or alcohol addiction, and participate or agree to participate in substance abuse treatment.

156.    For an individual to be eligible for inpatient care at the Facility, Plaintiff's medical personnel must determine that the patient is suffering from drug or alcohol addiction to such a degree that they are unable to care for themselves.

157.    While being treated at the Facility, Plaintiffs' patients are not illegally using controlled substances. As such, their patients are "qualified persons with disabilities" within the meaning of the ADA, 42 U.S.C. § 12102(2) and 28 C.F.R. § 35.104.

158.    The Defendants are qualifying public entities within the meaning of the ADA. 42 U.S.C. § 12131(1)(A).

159.    Section 12132 of the ADA constitutes a general prohibition against discrimination on the basis of disability by public entities.

160.    The Defendants have violated, and are continuing to violate the ADA, by, *inter alia*: (i) feigning a lack of jurisdiction to rule on Phase I of the Major Site Plan, thereby effectively banning the entire Facility; (ii) intentionally misclassifying the Facility's four step-down residential inpatient treatment buildings as apartments which require a use variance when that was not the case; (iii) refusing to engage in a reasonable accommodation analysis in connection with its denial of 1840 P., LLC's Use Variance Application; (iv) allowing official and community prejudice against the Plaintiffs' disabled patients to dictate the outcome of the zoning hearings;

and, (v) discriminating against the Plaintiffs and the disabled patients that they are committed to serve.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, and request that the Court grant the following relief:

(i)     Declaratory relief stating that the Defendants' improper denials of 1840 P., LLC's Appeal Application and Use Variance Application constituted violations of the ADA and that Plaintiffs and their patients are entitled to reasonable accommodations to facilitate the construction and operation of the Facility as planned;

(ii)    Preliminary and permanent injunctive relief permitting Plaintiffs' construction and operation of the Facility as planned, and enjoining the Defendants from obstructing or interfering with Plaintiffs' construction and operation thereof;

(iii)   Compensatory damages;

(iv)    Punitive damages;

(v)     Attorneys' fees and costs; and,

(vi)    Such other and further relief as the Court deems necessary and appropriate.

## SECOND CLAIM FOR RELIEF
### (Violation of the Fair Housing Act of 1988)

161.    Paragraphs 1 through 160 above are incorporated by reference, as if fully set forth herein.

162.    The Fair Housing Act, 42 U.S.C. § 3601, *et seq*., ("FHA") guarantees fair housing to handicapped individuals.

163.    Under the FHA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such impairment, or being regarded as having such an impairment." 42 U.S.C. § 3602(h).

The term "physical or mental impairment" includes "alcoholism" and "drug addiction (other than addiction caused by current, illegal use of a controlled substance)." 24 C.F.R. § 100.201.

164.    Plaintiffs' patients are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12101.

165.    Under the FHA, it is unlawful to discriminate against or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of that buyer, renter, or person residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(1).

166.    Plaintiffs' residential treatment buildings within the Facility qualify as dwellings under the FHA.

167.    The Defendants have violated, and are continuing to violate the FHA, by, *inter alia*: (i) feigning a lack of jurisdiction to rule on Phase I of the Major Site Plan, thereby effectively banning the entire Facility; (ii) intentionally misclassifying the Facility's four step-down residential inpatient treatment buildings as apartments which require a use variance when that was not the case; (iii) refusing to engage in a reasonable accommodation analysis in connection with its denial of 1840 P., LLC's Use Variance Application; (iv) allowing official and community prejudice against the Plaintiffs' disabled patients to dictate the outcome of the zoning hearings; and, (v) discriminating against the Plaintiffs and the disabled patients that they are committed to serve.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, and request that the Court grant the following relief:

(i)    Declaratory relief stating that the Defendants' improper denials of 1840 P., LLC's Appeal Application and Use Variance Application constituted violations of the FHA and that

Plaintiffs and their patients are entitled to reasonable accommodations to facilitate the construction and operation of the Facility as planned;

(ii)     Preliminary and permanent injunctive relief permitting Plaintiffs' construction and operation of the Facility as planned, and enjoining the Defendants from obstructing or interfering with Plaintiffs' construction and operation thereof;

(iii)     Compensatory damages;

(iv)     Punitive damages;

(v)     Attorneys' fees and costs; and,

(vi)     Such other and further relief as the Court deems necessary and appropriate.

### THIRD CLAIM FOR RELIEF
#### (Violation of the Rehabilitation Act of 1973)

168.     Paragraphs 1 through 167 above are incorporated by reference, as if fully set forth herein.

169.     The Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, provides that no qualified individual with a disability shall, solely by reason of her or his disability, be excluded from participation in or be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

170.     The Township of Gloucester receives federal financial assistance, including through federal grant programs such as the Community Development Block Grant program, which is funded by the U.S. Department of Housing and Urban Development.

171.     Section 508 of the Rehabilitation Act defines "program or activity" as "all of the operations" of specific entities, including "a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A).

172.   Zoning decisions by a municipality are normal functions of a governmental entity and thus are covered by the Rehabilitation Act.

173.   Plaintiffs' patients are qualified persons under the Rehabilitation Act with disabilities that substantially impair one or more major life activities.

174.   The first criterion for admission to any part of the Facility is that patients be diagnosed as suffering from drug or alcohol addiction, and participate or agree to participate in substance abuse treatment.

175.   For an individual to be eligible for inpatient care at the Facility, Plaintiffs' medical personnel must determine that the patient is suffering from drug or alcohol addiction to such a degree that they are unable to care for themselves.

176.   While at the Facility, Plaintiffs' patients are not illegally using controlled substances. As such, their patients are "qualified persons with disabilities" within the meaning of the Rehabilitation Act, 29 U.S.C. § 706(8)(C)(ii)(II).

177.   The Board is a qualifying public entity within the meaning of the Rehabilitation Act.

178.   Section 508 of the Rehabilitation Act constitutes a general prohibition against discrimination on the basis of disability by public entities.

179.   The Defendants have violated, and are continuing to violate the Rehabilitation Act by, *inter alia*: (i) feigning a lack of jurisdiction to rule on Phase I of the Major Site Plan, thereby effectively banning the entire Facility; (ii) intentionally misclassifying the Facility's four step-down residential inpatient treatment buildings as apartments which require a use variance when that was not the case; (iii) refusing to engage in a reasonable accommodation analysis in connection with its denial of 1840 P., LLC's Use Variance Application; (iv) allowing official and community prejudice against the Plaintiffs' disabled patients to dictate the outcome of the zoning

hearings; and, (v) discriminating against the Plaintiffs and the disabled patients that they are committed to serve.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, and request that the Court grant the following relief:

(i)     Declaratory relief stating that the Defendants' improper denials of 1840 P., LLC's Appeal Application and Use Variance Application constituted violations of the Rehabilitation Act and that Plaintiffs and their patients are entitled to reasonable accommodations to facilitate the construction and operation of the Facility as planned;

(ii)     Preliminary and permanent injunctive relief permitting Plaintiffs' construction and operation of the Facility as planned, and enjoining the Defendants from obstructing or interfering with Plaintiffs' construction and operation thereof;

(iii)     Compensatory damages;

(iv)     Punitive damages;

(v)     Attorneys' fees and costs; and,

(vi)     Such other and further relief as the Court deems necessary and appropriate.

## FOURTH CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 1983)

180.     Paragraphs 1 through 179 above are incorporated by reference, as if fully set forth herein.

181.     Under color of State law, the Board improperly denied 1840 P., LLC's Appeal Application and Use Variance Application.

182.     The Board's illegal and improper actions are not roughly proportional to the public good sought to be achieved and are grossly disproportionate to any asserted public interest

because they unduly deprive 1840 P., LLC's of its constitutional rights far beyond what is reasonable, legal, or necessary.

183.   The Board's actions are illegal because they prevent, frustrate, and impede 1840 P., LLC's by-right use and enjoyment of its Property and Facility.

184.   The Board's conduct was arbitrary, capricious, unreasonable, malicious, discriminatory, in bad faith and shocks the conscience.

185.   Accordingly, the Board's actions violate the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, and request that the Court grant the following relief:

(i)    Declaratory relief stating that the Defendants' improper denials of 1840 P., LLC's Appeal Application and Use Variance Application constituted violations of the Constitution and 42 U.S.C. § 1983 and that Plaintiffs and their patients are entitled to reasonable accommodations to facilitate the construction and operation of the Facility as planned;

(ii)   Preliminary and permanent injunctive relief permitting Plaintiffs' construction and operation of the Facility as planned, and enjoining the Defendants from obstructing or interfering with Plaintiffs' construction and operation thereof;

(iii)  Compensatory damages;

(iv)   Punitive damages;

(v)    Attorneys' fees and costs; and,

(vi)   Such other and further relief as the Court deems necessary and appropriate.

**FIFTH CLAIM FOR RELIEF**
**(Substantive Due Process – Fifth and Fourteenth Amendments, and 42 U.S.C. § 1983)**

186.    Paragraphs 1 through 185 above are incorporated by reference, as if fully set forth herein.

187.    The Board's acts in denying 1840 P., LLC's Appeal Application and Use Variance Application violated 1840 P., LLC's right to substantive due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution, by arbitrarily, irrationally and unreasonably interfering with 1840 P., LLC's right to use and develop its Property and Facility.

188.    The Board's actions were undertaken in bad faith, and shock the conscience.

189.    1840 P., LLC, having acquired a fee simple interest in the Property, has the right to use and enjoyment thereof.

190.    That right includes the ability to develop the Property, a right inherent in the title to the Property.

191.    Plaintiffs have distinct and definite investment-backed expectations in their ability to develop, use and enjoy the Property and Facility.

192.    The Board's actions, which were arbitrary, capricious, illegal and conscience-shocking, directly interfered with Plaintiff's legitimate investment-backed expectations.

193.    The Board's actions, including its improper denials of 1840 P., LLC's Appeal Application and Use Variance Application, have deprived 1840 P., LLC of a legally-permitted, economically beneficial use of the Property authorized by Gloucester Township's Zoning Ordinance.

194.    By virtue of the Board's arbitrary, capricious, and unreasonable exercise of its powers, the Board has violated the Fifth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, and request that the Court grant the following relief:

(i)     Declaratory relief stating that the Defendants' improper denials of 1840 P., LLC's Appeal Application and Use Variance Application constituted violations of the Constitution and 42 U.S.C. § 1983 and that Plaintiffs and their patients are entitled to reasonable accommodations to facilitate the construction and operation of the Facility as planned;

(ii)    Preliminary and permanent injunctive relief permitting Plaintiffs' construction and operation of the Facility as planned, and enjoining the Defendants from obstructing or interfering with Plaintiffs' construction and operation thereof;

(iii)   Compensatory damages;

(iv)    Punitive damages;

(v)     Attorneys' fees and costs; and,

(vi)    Such other and further relief as the Court deems necessary and appropriate.

### SIXTH CLAIM FOR RELIEF
### (Violation of State Law)

195.   Paragraphs 1 through 194 above are incorporated by reference, as if fully set forth herein.

196.   The Zoning Board was wrong as a matter of law, palpably abused its discretionary authority and acted in an arbitrary and capricious manner when it denied 1840 P., LLC's Appeal Application, and affirmed the Administrative Officer's improper finding that the Facility required a use variance.

197.   The Zoning Board is a quasi-judicial body charged with providing applicants with a fair and impartial hearing on matters before it, and whose function is to apply the facts

presented at the hearing to the legal requirements so that it may decide whether Plaintiffs' Facility is in compliance with the uses permitted by the zoning Ordinance.

198.    The Zoning Board ignored the uncontroverted evidence establishing that the Facility is a permitted use in the IN zone as a residential healthcare facility, hospital, sanatorium, or long-term care facility.

199.    The Zoning Board ignored the uncontroverted evidence which established that all patients residing at the Facility, including patients residing at the four residential step-down inpatient buildings, will undergo treatment for drug and alcohol addiction.

200.    The Zoning Board failed to properly act within its quasi-judicial capacity when it denied 1840 P., LLC's Appeal Application.

201.    The Zoning Board's actions are conscience shocking and in direct contravention of the Municipal Land Use Law, the Township Ordinance, and the laws of the State of New Jersey.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, and request that the Court grant the following relief:

(i)    Declaratory relief stating that the Board's actions were arbitrary, capricious, unreasonable, and in violation of the New Jersey Municipal Land Use Law, the Township Ordinance, and the laws of the State of New Jersey;

(ii)    Entry of an Order overturning the Board's denial of 1840 P., LLC's Appeal Application;

(iii)    Preliminary and permanent injunctive relief permitting Plaintiffs' construction and operation of the Facility as planned, and enjoining the Defendants from obstructing or interfering with Plaintiffs' construction and operation thereof;

(iv)    Compensatory damages;

(v)    Punitive damages;

(vi)   Attorneys' fees and costs; and,

(vii)  Such other and further relief as the Court deems necessary and appropriate.

## SEVENTH CLAIM FOR RELIEF
### (Violation of State Law)

202.   Paragraphs 1 through 201 above are incorporated by reference, as if fully set forth herein.

203.   The Zoning Board erred as a matter of law and acted in an arbitrary and capricious manner when it denied 1840 P., LLC's Use Variance Application.

204.   The Zoning Board improperly disregarded the competent and uncontroverted testimony of Dr. DeShields, an independent doctor who has practiced addiction medicine in the Gloucester Township area for twenty years, which established that the Facility will fundamentally serve the public health, welfare and good, especially given Gloucester Township's critical need for such a facility.

205.   The Zoning Board improperly disregarded the competent and uncontroverted testimony of Dr. Carise, a leading expert in addiction treatment, which established that the Facility would improve patient outcomes through its innovative treatment model, and would help reduce the number of drug and alcohol addicted persons in Gloucester Township and the surrounding area.

206.   The Zoning Board improperly disregarded the testimony of Terry Combs that the Facility is an inherently beneficial use that will not have a negative impact on the surrounding community.

207.   The Zoning Board failed to properly act in its quasi-judicial capacity when it denied 1840 P., LLC's Use Variance Application.

208.   The Zoning Board's actions are conscience shocking and in direct contravention of the Municipal Land Use Law, the Township Ordinance, and the laws of the State of New Jersey.

209.   Defendant Zoning Board palpably abused its discretionary authority in determining that 1840 P., LLC's Application for Major Site Plan required a use variance.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, and request that the Court grant the following relief:

(i)   Declaratory relief stating that the Board's actions were arbitrary, capricious, unreasonable, and in violation of the New Jersey Municipal Land Use Law, the Township Ordinance, and the laws of the State of New Jersey;

(ii)   Entry of an Order overturning the Board's denial of 1840 P., LLC' application for a use variance;

(iii)   Preliminary and permanent injunctive relief permitting Plaintiffs' construction and operation of the Facility as planned, and enjoining the Defendants from obstructing or interfering with Plaintiffs' construction and operation thereof;

(iv)   Compensatory damages;

(v)   Punitive damages;

(vi)   Attorneys' fees and costs; and,

(vii)   Such other and further relief as the Court deems necessary and appropriate.

## EIGHTH CLAIM FOR RELIEF
### (Violation of New Jersey Law Against Discrimination)

210.   Paragraphs 1 through 209 above are incorporated by reference, as if fully set forth herein.

211.    The New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.*, prohibits a "municipality, county or other local civil or political subdivision of the State of New Jersey, or an officer, employee, or agent thereof to exercise the power to regulate land use or housing in a manner that discriminates" on the basis of disability. N.J.S.A. 10:5-12.5.

212.    Under the NJLAD, disability means "physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness" or "any mental, psychological or developmental disability … resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically," N.J.S.A. 10:5-5(q), which definition has been construed by the courts to include alcohol and substance dependence.

213.    The Zoning Board violated Plaintiffs' rights and violated the NJLAD by denying 1840 P., LLC's Appeal Application and thereby determining that the Facility required a use variance in contravention of the Gloucester Township Zoning Ordinance and based upon improper discrimination against Plaintiffs and their patients.

214.    The Zoning Board violated Plaintiffs' rights and violated the NJLAD by denying 1840 P., LLC's Use Variance Application in contravention of the Municipal Land Use Law and based upon improper discrimination against Plaintiffs and their patients.

215.    The Zoning Board has exercised its powers to regulate land use in a way that discriminates against disabled persons without justification or cause by preventing development of a residential healthcare facility that is necessary for their treatment and rehabilitation.

216.    The Zoning Board's conduct was arbitrary, capricious, unreasonable, malicious, in bad faith and shocks the conscience.

217.    The Zoning Board's wrongful actions prohibit Plaintiffs from providing a residential treatment facility on a property where it is permitted to operate and such action is discriminatory on its face against persons with disabilities, a discrete and insular minority that faces restrictions and limitations and has been subjected to a history of purposeful unequal treatment.

218.    Because of the Zoning Board's denial of 1840 P., LLC's Appeal Application and Use Variance Application, Plaintiffs have expended significant time and financial resources, have lost the opportunity to timely conduct their business and provide a much-needed service, and are incurring substantial damages.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants, jointly and severally, and request that the Court grant the following relief:

(i)     Declaratory relief stating that the Board's actions were arbitrary, capricious, unreasonable, and in violation of the NJLAD;

(ii)    Entry of an Order overturning the Board's improper denials of 1840 P. LLC's Appeal Application and Use Variance Application;

(iii)   Preliminary and permanent injunctive relief permitting Plaintiffs' construction and operation of the Facility as planned, and enjoining the Defendants from obstructing or interfering with Plaintiffs' construction and operation thereof;

(v)     Compensatory damages;

(vi)    Punitive damages;

(vii)   Attorneys' fees and costs; and,

(viii)   Such other and further relief as the Court deems necessary and appropriate.

KAUFMAN, COREN & RESS, P.C

David M. DeVito, Esq. (DD 5946)
Steven M. Coren, Esq.
(admission *pro hac vice* to be sought)
Evan Coren, Esquire
(admission *pro hac vice* to be sought)
Two Commerce Square
2001 Market Street, Suite 3900
Philadelphia, PA 19103
Tel.: (215) 735-8700
Fax: (215) 735-5170
ddevito@kcr-law.com
scoren@kcr-law.com
ecoren@kcr-law.com

Jack Plackter, Esq.
Bridget A. Sykes, Esq.
FOX ROTHSCHILD LLP
Midtown Building
1301 Atlantic Avenue, Suite 400
Atlantic City, New Jersey 08401
Tel.: (609) 348-4515
Fax: (609) 348-6834

Attorneys for Plaintiffs

Dated:   March 24, 2016